Robert E. Sabido, OSB No. 964168
rsabido@cosgravelaw.com
COSGRAVE VERGEER KESTER LLP
888 SW Fifth Avenue, Suite 500
Portland, Oregon 97204
Telephone:      (503) 323-9000
Facsimile:      (503) 323-9019

Douglas N. Masters (admitted pro hac vice)
dmasters@loeb.com
Nathan J. Muyskens (admitted pro hac vice)
nmuyskens@loeb.com
Emily H. Stone (admitted pro hac vice)
estone@loeb.com
321 North Clark, Suite 2300
Chicago, IL 60654
Telephone:      (312) 464-3100
Fax:            (312) 896-5707

         Attorneys for Defendant USA Track & Field


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| GOLD MEDAL LLC dba RUN GUM, | Case No.  6:16-cv-00092-MC |
| Plaintiff, | **DEFENDANT USA TRACK & FIELD'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT** (Pursuant to Fed. R. Civ. P. 12(b)(6)) |
| v. | |
| USA TRACK & FIELD and UNITED STATES OLYMPIC COMMITTEE, | **REQUEST FOR ORAL ARGUMENT** |
| Defendants. | |

**LOCAL RULE 7-1 CERTIFICATION**

Counsel for defendant USA Track & Field, Loeb & Loeb LLP and Cosgrave Vergeer
Kester LLP, conferred with counsel for plaintiff about the dispute through a telephone
conference, but the parties have been unable to resolve the dispute.

**LOCAL RULE 7-2 CERTIFICATION**

This memorandum complies with the word-count limitation under LR 7-2(b) because it
contains less than 5,000 words.

Page 1 -  **DEFENDANT USA TRACK & FIELD'S MOTION TO DISMISS AND
          MEMORANDUM IN SUPPORT**
                                                                    2539841

## MOTION

In accordance with Fed. R. Civ. P. 12(b)(6), USA Track & Field moves to dismiss the complaint because it fails to state a claim upon which relief may be granted.

## MEMORANDUM

## I.    INTRODUCTION

### A.    Factual Background

USA Track & Field ("USATF") is a volunteer-driven not-for-profit organization dedicated to the promotion of track and field in the United States.  With more than 100,000 members, USATF is the National Governing Body ("NGB") for track and field, long-distance running, and race walking in the United States.  USATF organizes hundreds of events each year and supports runners of all ages and skill levels from youth programs to elite athletes through stipends, grants and various funding programs.

As the NGB for track and field, federal law grants USATF the authority and autonomy to conduct the national championship for the sport.  However, Congress granted the United States Olympic Committee ("USOC") the exclusive right to control the selection of athletes to represent the United States in the Olympic Games.  Accordingly, every four years, rather than host an independent national championship, USATF agrees with the USOC to act as the USOC's organizer and manager for the Olympic Trials in order to select the individual athletes that will represent the United States at that year's Olympic Games.  Because it is a USOC Olympic Trials event, USATF is required to manage the event pursuant to the requirements and regulations of the USOC.  Complt. ¶¶ 38, 39.

One of the regulations that USATF is required to adopt sets certain limits for the logos on the athletes' attire during the competition, including that only logos of a manufacturer of athletic equipment may appear on the attire and that those logos may only be of limited number, size and location.  Complt. ¶ 10.  This regulation does not apply to logos and attire at any of the USATF's numerous other track and field events held throughout the year and throughout the United States.

*Id.* at ¶ 43. The Olympic Trials stand alone in this regard because it is the only event USATF hosts by direct delegation from, and at the pleasure of, the USOC.[1]

Based only on USATF's required adoption of the USOC's regulation, Plaintiff Run Gum alleges that USATF somehow conspired with the USOC and other unidentified corporate entities to violate the antitrust laws. *Id.* at ¶¶ 1-3. Run Gum claims that the purpose of this conspiracy is to keep Run Gum from being able to advertise on athletes' racing attire during the 2016 U.S. Olympic Track and Field trials in July of 2016. *Id.* at ¶ 12. According to Run Gum's complaint, advertising its gum on the jerseys of potential Olympic track and field athletes during this event is a unique and singular promotional opportunity, although it identifies no athlete that would agree to its sponsorship for the Olympic Trials, let alone one that would necessarily appear on the televised portion of the Trials. *Id.* at ¶ 16. Additionally, Run Gum fails to allege any economic benefit that USATF (or the USOC, for that matter) would enjoy as a result of the alleged conspiracy. In fact, according to the Complaint, only one athletic goods manufacturer is a USATF sponsor. *Id.* at ¶ 6.

**B.    Summary of Argument**

Despite its ability to place advertising on athletes' clothing at all of the other USATF events (Complt. ¶¶ 43-45) (not to mention a myriad of highly publicized corporate running events), Run Gum argues that the foreclosure of its ability to advertise its gum to consumers once every four years during this single event - the Olympic Trials - will cause it significant harm. While these allegations make little logical sense, they make even less sense under the antitrust laws and this complaint must be dismissed for two clear reasons.

The first reason is that the Ted Stevens Olympic and Amateur Sports Act grants extensive and exclusive powers to the USOC to control Olympic Trials. Of central importance here, the

---

[1]    USATF could opt to hold a regular national championship during an Olympic year, which might result in the selection of athletes for the Olympic Team. However, it would not be branded as an "Olympic Trial," would not be permitted to mention the Olympics or in any way use or reference the Olympic name or marks and thus would no longer carry the value that Run Gum ascribes to the Olympic Trials in its Complaint.

USOC is the only National Olympic Committee that does not receive official government funding.  In order to facilitate its ability to raise money for United States participation in the Olympic Games, Congress grants the USOC exclusive power to organize, finance, and control the representation of the United States in the competitions and events of the Olympic Games.  Accordingly, the regulation at issue, which falls squarely within these central tenets, is immune from antitrust suit through the doctrine of implied immunity.  This immunity extends to those abiding by the regulation, as is the case here with USATF.  This fact is fatal to the complaint on its face, and because it cannot be cured by amendment, dictates that the complaint be dismissed with prejudice.

The second reason, which is equally fatal to the complaint, is that Run Gum fails to adequately allege two key elements of a Section 1 Sherman Act claim.  First, it does not allege a legally cognizable agreement between USATF and any other party.  USATF did not agree with the USOC to restrict logos on athletes' clothing during the Olympic Trials, but merely acquiesced in adopting the regulation at issue as *required* by the USOC, a fact repeatedly acknowledged in the complaint.  In fact, other than this single instance in which it was required to adopt the regulation, Run Gum acknowledges that USATF places no such restrictions when USATF is in charge of sponsorship and advertising rules at its many other events.  Moreover, Run Gum utterly fails to adequately allege any agreement between USATF and the "unnamed co-conspirators" other than a conclusory allegation that such an agreement exists.  There is nothing pled about the nature of such an agreement, any terms of the agreement, the form of the agreement, when the agreement was made or its scope.  Simply put, the complaint fails to allege USATF agreed with anyone to violate the antitrust laws and thus must be dismissed.

Second, Run Gum's alleged relevant product market – a specific advertising opportunity at a single event that takes place every four years – is facially unsustainable.  This "market" is impossibly narrow and does not take into account obvious economic substitutes.  It is precisely the type of relevant market that is so deficient on its face that it cannot survive dismissal, which

was precisely the result in a recent case within this Circuit in which the plaintiffs attempted to allege a strikingly similar relevant market.

Run Gum's desire to free ride on the Olympic name through "ambush" advertising at a single event does not an antitrust claim make. It is certainly not a claim that is sustainable as to USATF. This complaint must be dismissed and with prejudice.[2]

## II.    THE COMPLAINT MUST BE DISMISSED BECAUSE THE USOC REGULATION IS IMMUNE FROM ANTITRUST CHALLENGE

Congress granted the USOC extensive powers through the Amateur Sports Act of 1978, which was later amended by the Ted Stevens Olympic and Amateur Sports Act (the "ASA"). 36 U.S.C. § 220501 *et seq.* The ASA grants the USOC "exclusive jurisdiction, directly or through constituent members or committees, over . . . all matters pertaining to United States participation in the Olympic Games . . ." 36 U.S.C. § 220503(3)(A) (2012). Congress authorized the USOC to recognize one National Governing Body ("NGB") for each sport included in the Olympic games. *Id.* at § 220521. USATF is the NGB for track and field, long distance running, and race walking. Complt. ¶ 25. The USOC controls the selection of athletes to represent the United States in the Olympics, but may designate that responsibility to an NGB. 36 U.S.C. § 220505(c)(3). Such is the case for the Olympic Trials in track and field.

Courts have routinely immunized NGBs from antitrust scrutiny under the ASA. *See Behagen v. Amateur Basketball Assoc.,* 884 F.2d 524, 530 (10th Cir. 1989) (exempting NGB rule prohibiting multiple reinstatements to amateur status from antitrust challenge); *JES Properties, Inc. v. USA Equestrian, Inc.,* 2005 U.S. Dist. LEXIS 43122 at *33 (M.D. Fla. May 9, 2005) (exempting NGB rule limiting competing horse show competitions within certain distances of each other absent a waiver); *accord Eleven Line, Inc. v. N. Texas Soccer Ass'n, Inc.,* 215 F.3d 189, 204-05 (5th Cir. 2000) (noting that if challenged rule prohibiting players from playing in non-sanctioned facilities had been promulgated or expressly approved by the NGB of the sport, it

---

[2]  USATF also adopts and incorporates USOC's Memorandum in Support of its Motion to Dismiss as if fully stated herein.

would be immune from antitrust challenge).  As further explained below, immunity is particularly appropriate in this case because the challenged NGB activity- protecting the Olympic brand- flows directly from the statutory authority granted to the USOC and through the USOC to USATF.  *See JES Properties,* 2005 U.S. Dist. LEXIS 43122 at *33 (holding that plaintiffs' antitrust claims against defendant promoters were barred based on those defendants' "conduct in compliance with, and pursuant to, the rules and regulations of [an NGB]."); *Behagen*, 884 F.2d at 530 (holding immunity applied to "defendants," which included the NGB's executive director).

Critically to the case at bar, "[t]he fundamental purpose of th[e ASA] was to safeguard the USOC's ability to raise the financial resources that are a critical component of America's capacity to send world-class amateur athletes into international competition without the massive government subsidies enjoyed by competitors from other nations."  *U.S. Olympic Comm. v. Intelicense Corp., S.A.*, 737 F.2d 263, 264 (2d Cir. 1984).  "[I]t is clear that the Congressional intent in enacting [the ASA] was to promote the United States Olympic effort by entrusting the USOC with unfettered control over the commercial use of Olympic-related designations" to "facilitate the USOC's ability to raise those financial resources from the private sector that are needed to fund the United States Olympic Movement."  *Id.* at 266.  Indeed, the Supreme Court has explained that Congress unambiguously intended to grant the USOC exclusivity over the Olympic brand to enable the USOC to generate revenue to finance the United States involvement in the Olympic Games.  *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 537-39 (1987); *see* 36 U.S.C. § 220506(a)(2)-(4) (granting the USOC the exclusive rights to the Olympic Rings, the emblem of the United States Olympic Committee, and the words "Olympic" or "Olympiad" in any combination.).

The USOC's regulation, adopted by USATF in conjunction with its staging of the Olympic Trials as required by the USOC, and challenged by Run Gum, enables the USOC to fully exploit its rights in the Olympic-related designations.  That regulation provides:

> *With the exception of standard manufacturers' equipment identification permitted by Rule 50 of the Olympic Charter . . . , the equipment, uniforms and the bibs/numbers of the competitors and officials at the Trials may not bear any commercial identification or promotional material of any kind (whether commercial or noncommercial).*

Complt. ¶ 9. Run Gum challenges this regulation because it prevents Run Gum from free-riding and infringing upon the USOC's rights, ordained by Congress, to raise money in association with the Olympic games.[3] *Id.* ¶ 28.

The regulation challenged by Run Gum goes to the heart of Congress's grant of exclusive power to the USOC to use the Olympic name and symbol to fund the United States' participation in the Olympic Games. The regulation does not favor a single sponsor or disparage a sponsor's competitors in an anti-competitive manner. *Cf. TYR Sport, Inc. v. Warnaco Swimwear, Inc.,* 679 F. Supp. 2d 1120, 1134-35 (C.D. Cal. 2009) (finding no antitrust immunity where NGB actively promoted a specific manufacturer (Speedo), made false statements regarding Speedo's products' superiority and the inferiority of competing products, and even obscured the logos of competitor products because the case did "not involve the promulgation of a rule, but rather a pattern of commercial conduct aimed at selling products for a corporate sponsor.") Consequently, these regulations are immune from antitrust challenges. Dismissal with prejudice is proper because this immunity renders amendment futile. *See Cervantes v. Countrywide Home Loans, Inc.,* 656 F.3d 1034, 1042 (9th Cir. 2011).

## III.    RUN GUM HAS FAILED TO STATE A CLAIM UNDER THE ANTITRUST LAWS

While immunity is fatal to Run Gum's complaint, dismissal is also required on the additional and independent ground that Run Gum has failed to adequately state an antitrust claim. "On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim is 'plausible' in light of basic economic principles." *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). This case simply is not plausible. Even when viewed in the light most

---

[3]  Notably, Run Gum has not alleged that it has attempted to become a USOC or USATF sponsor in any manner, not simply limited to the Olympic Trials.

favorable to Plaintiff, the complaint fails this requirement of *Twombly* and its progeny because it fails to adequately allege either an agreement to restrain trade or a relevant product market.

> ### A. Run Gum Fails to Adequately Allege USATF Entered into an Agreement to Restrain Trade
>
> #### 1. The Complaint Does Not Adequately Allege An Agreement Between USATF and USOC

Run Gum's complaint fails to adequately allege the very first requirement for any Section 1 violation: an actual *agreement* that restrains trade. *See Standard Oil of New Jersey v. United States,* 221 U.S. 1, 59-60 (1911). An agreement must involve "concerted action of more than a single entity." *Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978, 983 (9th Cir. 2001). Such "concerted action" requires "'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* at 983 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764 (1984)). In *Toscano*, the plaintiff, a professional golfer, brought an antitrust action against the PGA and the sponsors of its Senior PGA Tour tournaments, alleging that the PGA's rules restricting players' participation in competing golf programs without PGA permission effectively prevented potential competing golf tournaments from succeeding and competing. *Id.* at 982. The court rejected the plaintiff's assertion that a provision in the local sponsors' contracts with the PGA Senior Tour in which the local sponsors "agree[d] to organize and conduct the tournament in accordance with PGA Rules and Regulations" constituted an agreement in restraint of trade. The court reasoned that "the defendants merely accepted the PGA Tour's rules and regulations and played no role in creating or enforcing them." *Id.* at 892-93.

Run Gum's hollow allegations regarding USATF's participation in an "agreement" mirror those expressly rejected in *Toscano*. It is clear from the face of the complaint that USATF's acceptance of the USOC's rules and regulations is simply a necessary condition in the USOC's delegating to USATF the opportunity to conduct an Olympic Trials event and use the Olympic brand:

- "The 2016 Olympic Trials Uniform Advertising and Logo Regulations specify that '[a]s a U.S. Olympic Committee event, the U.S. Olympic Team Trials… **_are subject to_** IOC and USOC advertising regulations for athletes' apparel and uniforms." Complt. ¶ 34 (emphasis added);

- USATF's citation of the rules and regulations is predicated with the phrase "**_As required by the USOC_**. . . . *Id.* ¶¶ 9, 35; 38(c).

In fact, the Complaint acknowledges that when empowered to do so, USATF does *not* choose to restrict uniform advertising and logos when not "required [to do so] by the USOC." *See* Complt. ¶¶ 43-45 (noting "the absence of the same restrictions at other USATF events" where "athletes are permitted to wear the names and logos of individual sponsors of their choice. . . .").

The compulsory nature of USATF's acceptance of USOC's rules and regulations regarding uniform advertising and logos is underscored by the very nature of the USOC's exclusive powers in selecting participants for the Olympics and in controlling the use of the Olympic brand. *See* 36 U.S.C. § 220503(3)(A) (granting USOC exclusive jurisdiction over "representation of the United States in the games"); *id.* at § 220505(c)(3) (providing USOC with full control over events – including the Olympic Trials – that are designed to "obtain . . . amateur representation for those games."); *id.* at § 220506(a)(2)-(4) (granting the USOC the exclusive rights to the Olympic Rings, the emblem of the United States Olympic Committee, and the words "Olympic" or "Olympiad" in any combination.). While USATF could simply hold a national championship in an Olympic year independent of the USOC, it would not be permitted to do so and brand it as an Olympic Trials or otherwise use the Olympic name or mark. Accordingly, in order to enjoy this delegation to organize the event that selects Team USA for the Olympics as an "Olympic Trials," USATF follows the USOC's rules and regulations.

The USOC's exclusive authority – and USATF's required subservience to that authority – eviscerates the notion that USATF participated in an anti-competitive agreement by adopting USOC's regulations. USATF is no different than any other actor who "merely agreed to purchase products or provide a service under conditions set by the other party," which does not rise to the level of a "'conscious commitment to a common scheme designed to achieve an

unlawful objective.'" *Toscano*, 258 F.3d at 984 (citing *Monsanto,* 465 U.S. at 764).  This tenet acknowledges the common sense fact that "[a] manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently . . . . And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination." *Monsanto Co.*, 465 U.S. at 761 (citations omitted)); *see also Am. Airlines v. Christensen*, 967 F.2d 410, 413-14 (10th Cir. 1992) (holding no agreement where airline independently set the terms of its travel awards program and members merely accepted those terms); *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp.2d 1218, 1239-40 (E.D. Cal. 1999) (unilaterally imposed clause in a contract did not constitute concerted action required for Section 1 group boycott claim); *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1199 (S.D. Tex. 2009) ("the fact that a person accepts the terms of a contract does not, without more, generate the type of concerted action necessary to violate Section 1").  In this case, USATF has agreed to conduct the Olympic Trials and the conditions that accompany conducting this event are completely analogous to any normal and perfectly legal condition of sale.  This is not an illegal agreement.

Because the only facts pled regarding an antitrust agreement relate to a compulsory adoption of USOC's rules by USATF, the complaint fails on its face to adequately allege an antitrust agreement and should be dismissed as a matter of law.

2.    **The Complaint Does Not Adequately Allege an Agreement Between USATF and the Unnamed Coconspirators**

*Twombly* makes clear that a plaintiff must plead "factual allegations [that] raise a right to relief above a speculative level" rather than mere "labels and conclusions."  *Twombly,* 550 U.S. at 555.  This is true with respect to allegations of agreement in the antitrust context, which "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made.  *Id.* at 556.  Run Gum has not met this burden with respect to its alleged "agreement" between USATF and the "unnamed co-conspirators."

In the two paragraph section of the complaint dedicated to the "unnamed co-conspirators," Run Gum alleges in conclusory fashion that these unnamed entities "actively participated as unnamed conspirators with the defendants in the violations and conspiracy alleged in the complaint" and "have performed overt acts and made statements in furtherance of the antitrust violations." Complt. ¶ 26. This "does not answer the basic questions" about any anticompetitive agreement, "who, did what, to whom (or with whom), where and when?" *Kendall Visa U.S.A., Inc.,* 518 F.3d 1042, 1048 (9th Cir. 2008) (affirming dismissal for failure to adequately plead facts indicating antitrust agreement). These vague allegations of a conspiracy fail to meet even the most liberal reading of the specificity requirements set forth in *Twombly* and its progeny.

### B.    Run Gum Fails to Allege a Properly Defined Relevant Product Market

#### 1.    The Product Market Run Gum Alleges is Impermissibly Narrow

"In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.'" *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). A properly defined relevant market "includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Tanaka v. Univ. of So. Cal.,* 252 F.3d 1059, 1063 (9th Cir. 2001). "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Id.*; *accord Newcal Indus.*, 513 F.3d at 1045 ("a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable."); *Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC,* 87 F. Supp. 3d 874, 886-87 (denying motion for preliminary injunction because the "proposed relevant market cannot stand because it is comprises [sic] a single brand product" of live Cubs games.).

In its complaint, Run Gum alleges the relevant market as "sponsoring individual athletes at the upcoming July 1-10, 2016 U.S. Olympic Track & Field Team Trials in Eugene, Oregon ('the Olympic Trials'), in exchange for sponsor identification on the athletes' competition

apparel." Complt. ¶ 1.  Thus, Run Gum is claiming that a distinct product market exists for

sponsoring individual athletes, at a single sports event held every four years, for a single sport,

though the placement of a logo/advertisement on the athlete's attire that the athlete wears during

a single particular event.  This impossibly narrow market is not a properly defined product

market under any reading of the antitrust laws.  It is "counterintuitive" that a product be "so

unique that it suffers no actual or potential competitors." *Apple, Inc. v. Psystar Corp.*, 586 F.

Supp. 2d 1190, 1198 (N.D. Cal. 2008); *see also Hack v. President & Fellows of Yale College,*

237 F.3d 81, 86 (2nd Cir. 2006) (affirming dismissal of antitrust claim where plaintiffs' alleged

relevant market consisted of a Yale education).

The facial implausibility of a properly defined relevant product market relating to

advertising on participant attire during live sporting events was thoroughly explained in a recent

opinion within this Circuit.  *See Hicks v. PGA Tour, Inc.,* Case No. 15-cv-00489-VC [Dkt. No.

106] (N.D. Cal. Feb. 9, 2016) (dismissing Sherman Act claim with prejudice).  The court in

*Hicks* squarely rejected the assertion that a relevant product market could exist with respect to

advertisements or endorsements on bibs worn by caddies on the PGA tour when obvious

alternatives existed:  "Companies that wish to advertise things like golf balls or luxury watches

to fans of pro golf can do so in a variety of ways:  television ads, magazine ads, internet ads,

posters at golf course clubhouses and more." *Id.* at 12.  The court acknowledged that although

different forms of advertising had distinct advantages and disadvantages, "[t]o implicate the

antitrust laws, [plaintiffs] must allege facts from which one could plausibly conclude that these

different methods of advertising to golf fans are not reasonably interchangeable." *Id.*  The court

further explained that

> [e]ven assuming the caddies are correct that an endorsement of a product by a
> golfer or caddie is sufficiently different from an advertisement without an
> endorsement, the endorsement market cannot be so narrowly defined as to include
> only in-play endorsements and not also endorsements communicated via other
> media, because it isn't plausible that an increase in the price of in-play
> endorsements would have no effect on the demand for other types of
> endorsements, or vice-versa.

*Id.* at 13.

The same reasoning and rationale applied to the strikingly similar alleged market in *Hicks*, applies with equal force to Run Gum's alleged relevant market. There is nothing alleged in the complaint – and it defies common sense – that makes plausible the assertion that a logo or advertisement on an athlete's apparel during one specific race held every four years is a tenable relevant market for an antitrust claim. This market is even more narrow than the one that the district court concluded in *Hicks* was "not natural" but rather "artificial [and] contorted to meet [the plaintiffs'] litigation needs." *Id.* at 14 (citing *Adidas Am.*, 64 F. Supp. 2d at 1102). Desiring a specific advertising opportunity or inexplicably basing a business plan around it (Complt. at ¶ 16) does not a relevant product market make. This is not the type of market the antitrust laws were designed to protect.

### 2. Any Conceivable Actual Relevant Market Would Include Numerous Economically Sound Alternatives For Run Gum

A properly defined relevant market "includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Colonial Med. Grp.*, 444 F. App'x at 938 (citation omitted). For Run Gum's advertising needs, this would obviously include options outside of simply advertising on athlete's apparel at the Olympic Trials. "On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim is 'plausible' in light of basic economic principles." *William O. Gilley Enters.*, 588 F.3d at 662 (quoting *Twombly*, 550 U.S. at 556).

Run Gum produces and sells gum. Complt. ¶ 15. Run Gum claims its gum is different than other gums in that it contains caffeine and other ingredients presumably designed to help the human body "perform optimally." *See* http://getrungum.com/pages/our-story [4]*; see also* Complt.

---

[4] This Court can take judicial notice of Run Gum's website. *See, e.g., Reese v. Malone*, 747 F.3d 557, 570 n. 8 (9th Cir. 2014) (taking judicial notice of a university website pursuant to Fed. R. Evid. 201 where the accuracy of the information on the website was not disputed); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) (taking judicial notice of information contained on a school district website and citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) for the proposition that "court's ruling on 12(b)(6)

¶ 15.  According to the Run Gum website the gum is to be used "[w]hen you are waking up before the sun for that am workout.  While doing sports or at play or at work.  During your lecture or study session. For those long days on the road or getting ready to go out at night."  *See* http://getrungum.com/pages/performance-gum.  Basic economic principles and simple common sense, both explored and explained by the court in *Hicks,* show that Run Gum has a wide array of alternatives for advertising than the narrowly defined product market it alleges.

From the Run Gum marketing materials, one could assume that any product that wakes one up or causes one to be more alert might be in the market.  On the face of the Complaint, Run Gum acknowledges that its product is not just for runners, but for "***athletes*** who want to optimize their performance without ingesting liquids."  Complt. ¶ 15 (emphasis supplied).  However, even if one is to assume that Run Gum is a product with some unique tie to running other than its name, and that the relevant geographic market is indeed the United States and its territories as Run Gum alleges, the advertising alternatives for Run Gum are voluminous even if one limits the choices to USATF events.  Over the course of four years there is one Olympic Trials.  Complt. ¶ 4.  During that same 4 year period there are scores of USATF events where the athletes are not restricted in sponsorship advertisements on their apparel.  Complt. ¶¶ 44-45.

This does not even take into account the enormous number of other running events in the alleged geographic market, such as marathons and road races that attract large numbers of fans and participants.  Run Gum's conclusory statement that "there is no reasonable opportunity for individual-athlete sponsors who are excluded from the Olympic Trials to receive commensurate economic benefit" from another event (Complt. ¶ 46) is implausible on its face.  In short, the idea that advertising on a single spot, on an athlete's attire, during a single track and field event, every four years is a properly defined product market is insupportable under even the most complimentary reading of the allegations in this complaint.

---

motions to dismiss may take into consideration 'matters of which a court may take judicial notice.'")

## CONCLUSION

For the reasons set forth above, the complaint should be dismissed with prejudice.

DATED:  February 26, 2016

                          COSGRAVE VERGEER KESTER LLP


                          **/s/ Robert E. Sabido**
                          Robert E. Sabido, OSB No. 96416
                          rsabido@cosgravelaw.com
                          Telephone: (503) 323-9000
                          Fax: (503) 323-9019

                          LOEB & LOEB


                          **/s/ Emily H. Stone**
                          Doug las N. Masters (admitted *pro hac vice*)
                          dmasters@loeb.com
                          Nathan J. Muyskens (admitted pro hac vice)
                          nmuyskens@loeb.com
                          Emily H. Stone (admitted *pro hac vice*)
                          estone@loeb.com
                          Telephone: (312) 464-3100
                          Fax: (312) 896-5707

                          Attorneys for Defendant USA Track & Field

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of the foregoing **DEFENDANT**

**USA TRACK & FIELD'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**

on the date indicated below by:

☐    mail with postage prepaid, deposited in the US mail at Portland, Oregon,

☐    hand delivery,

☐    facsimile transmission,

☐    overnight delivery,

☒    electronic filing notification;

Timothy P. Landis
Timothy Landis, P.C.
One SW Columbia Street, Suite 1110
Portland, OR  97258
    AND
Michael D. Hausfeld (admitted *pro hac vice*)
Sathya S. Gosselin (admitted *pro hac vice*)
Swathi Bojedla (admitted *pro hac vice*)
Hausfeld LLP
1700 K Street, NW, Suite 650
Washington, DC  20006
    AND
Michael P. Lehmann
Bonny E. Sweeney
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA  94111

    Attorneys for Plaintiff

Bruce L. Campbell
Miller Nash Graham & Dunn LLP
111 SW Fifth Avenue, Suite 3400
Portland, OR 97204
    AND
Alexander E. Ramey (admitted *pro hac vice*)
Derek Ludwin (admitted *pro hac vice*)
Covington & Burling LLP
One City Center
850 Tenth Street NW
Washington, DC 20001-4956

    Attorneys for Defendant
    United States Olympic Committee

    DATED: February 26, 2016


    */s/ Robert E. Sabido*
    Robert E. Sabido

COSGRAVE VERGEER KESTER LLP
Attorneys
888 SW Fifth Avenue, Suite 500
Portland, Oregon 97204
(503) 323-9000