IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GOLD MEDAL LLC d/b/a RUN GUM,

    Plaintiff,

v.

USA TRACK & FIELD and UNITED STATES OLYMPIC COMMITTEE,

    Defendants.

Civ. No. 6:16-cv-00092-MC

OPINION AND ORDER

MCSHANE, Judge:

Plaintiff Gold Medal LLC, doing business as Run Gum ("Run Gum"), brings this antitrust action against Defendants USA Track & Field ("USATF") and the United States Olympic Committee ("USOC"). Plaintiff alleges that the Defendants' policy forbidding athletes from competing at the 2016 Olympic Trials in apparel bearing individual sponsorship is an illegal restraint on trade under section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants move to dismiss Run Gum's complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Defendants argue four distinct theories supporting dismissal: (1) that Run Gum failed to allege a plausible agreement in restraint of trade under the Sherman Act; (2) that Run Gum has not adequately pled a plausible relevant market; (3) that Run Gum's allegations do not support a *per se* violation of the antitrust laws; and (4) that the Ted Stevens Olympic and Amateur Sports Act (the "ASA" or the "Act") provides Defendants with implied antitrust immunity.

1 – OPINION AND ORDER

Because congress charged Defendants with financing the United States' participation in the Olympics, in part by preserving the value of the Olympic brand, Run Gum's challenge fails under an implied grant of immunity. USATF and USOC may exercise control over the apparel worn by competitors on the field of competition at the Olympic Trials, particularly as it relates to individual advertisements and sponsorships that would undercut USOC's fundraising mission. For this reason, USATF's motion, ECF No. 43, and USOC's motion, ECF No. 41, are GRANTED and Run Gum's complaint is DISMISSED.

## BACKGROUND

Run Gum manufactures and sells chewing gum that contains caffeine, taurine, and b vitamins. Compl. ¶ 15, ECF No. 1. Run Gum markets its product to athletes, particularly runners, as a performance-optimizing alternative to coffee and energy drinks. Comp. ¶ 15. As part of its marketing scheme, Run Gum sponsors a team of professional runners who promote its product by wearing Run Gum branded apparel in competition. Compl. ¶ 16. Run Gum seeks to have its sponsored athletes compete in branded apparel at the 2016 Olympic Trials, compl. ¶ 16, which will be held July 1–10, 2016, in Eugene, Oregon, compl. ¶ 8.

USOC is a federally chartered corporation with exclusive jurisdiction over the United States' participation in the Olympic Games. 36 U.S.C. § 220503(3). As part of that authority, USOC is charged with organizing, financing, and controlling the representation of the United States in the Olympics. 36 U.S.C. 220505(c)(3). USOC may delegate that authority to various national governing bodies (NGBs) such as USATF, the NGB for track and field. *Id.*; compl. ¶ 4. Through such a delegation, USATF hosts and organizes the Olympic Trials every four years, an event which determines the membership of the U.S. Olympic Team. *See* compl. ¶ 4. Although USATF hosts and organizes the Trials, USOC governs, supervises, and funds USATF, and also

approves USATF's procedures for selecting members of the United States Olympic Team ("Olympic Team" or "Team USA"). Compl. ¶¶ 4, 25.

As required by the USOC, athletes are restricted in the kinds of advertising and logos they can display on their apparel while competing in the Olympic Trials.[1] Compl. ¶ 35. These restrictions are set out in a four-page document entitled "2016 Olympic Trials Uniform Advertising and Logo Regulations" ("the Regulations"), located on the USATF website. Compl. ¶ 33; *see also* compl., ECF No. 1-1. In these Regulations, USOC[2] forbids athletes from wearing "any commercial identification or promotional material" while competing at the Trials, with two exceptions. Compl. ¶ 35. First, athletes may wear apparel that features the name or logo of the apparel's manufacturer, subject to specific size and quantity restrictions. Compl. ¶¶ 10, 35. For example, an athlete wearing a competition top made by Nike may display Nike's name and logo on the front of the top. *See* compl. ¶¶ 10–11, 35. Second, athletes may wear uniforms bearing the name of a track club that is registered with USATF and approved by the USOC, again subject to size restrictions. Compl. ¶ 35; compl., ECF No. 1-1. Run Gum alleges that these exceptions demonstrate the existence of a horizontal and vertical agreement between USOC, USATF, and unnamed co-conspirators[3] to restrain trade. Compl. ¶¶ 26–27, 38.

Athletes who violate the advertising and logo rules may be disqualified from the Olympic Trials. Compl. ¶ 35. The Regulations note that athlete uniforms will be inspected for compliance during packet pick up and also during the final clerking process before competition. Compl. ¶¶ 9,

---

[1] Although Defendants also restrict advertising and logos on track and field equipment—such as vaulting poles—Run Gum only contests the advertising ban as applied to apparel. Accordingly, for simplicity, I will refer solely to apparel.
[2] The Regulations note that "[a]s a U.S. Olympic Committee event, the U.S. Olympic Team Trials . . . are subject to [International Olympic Committee] and USOC advertising regulations for athletes' apparel and uniforms." Compl., ECF No. 1-1.
[3] While Run Gum does not specifically identify these unnamed co-conspirators, it includes apparel and equipment manufacturers who sponsor individual athletes as part of the conspiracy. Compl. ¶ 26. Historically, such manufacturers have included companies such as adidas, ASICS, Mizuno, Nike, Puma, and Reebok. Compl. ¶ 11.

38; compl., ECF No. 1-1. The Regulations direct any questions to a USATF email address and grant USATF the discretion to determine whether a manufacturer's logo dominates or unduly distracts from a piece of apparel. Compl., ECF No. 1-1.

Run Gum alleges that USATF's and USOC's agreement to restrict individual sponsorships at the Olympic Trials is longstanding. Compl. ¶ 39. For instance, in March 2012, the USOC's Director of NGB Marketing Programs and Business Development asked USATF's interim CEO "to send an important reminder to athletes, agents, coaches and staff regarding apparel and equipment identification" during the 2012 Olympic Trials. Compl. ¶ 39. Run Gum alleges that USATF-issued guidelines from the 2008, 2012, and 2016 Trials confirm the agreement to ban nearly all commercial advertising on competition apparel. Compl. ¶ 38.

Although USOC and USATF broadly restrict companies from advertising on athletes' apparel during the Trials, they provide alternative marketing forums for would-be advertisers. Compl. ¶ 7. The products of "official sponsors," for example, are featured in conjunction with the competition in exchange for a fee. These sponsors are not limited to a particular kind of business or industry, but range from an automobile manufacturer to a credit card company to an online university, amongst others. Compl. ¶ 6. USATF also offers "a wide range of sponsors for itself" at the Trials which, while distinct from individual athlete sponsorships, provide marketing opportunities to companies like Run Gum. Compl. ¶ 7. Additionally, USATF independently hosts numerous other track and field competitions, such as the Indoor Championship Series and Outdoor Championship Series. Compl. ¶ 44. At these events, which do not involve USOC or the accompanying "Olympic" designation, athletes may wear apparel bearing individual sponsorships. Compl. ¶¶ 43–45.

## STANDARDS

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678.

While considering a motion to dismiss, the court must accept all allegations of material fact as true and construe those facts in the light most favorable to the non-movant. *Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir.2000). However, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. Specifically under Section 1 of the Sherman Act, "claimants must plead not just ultimate facts (such as a conspiracy), but evidentiary facts"—bare allegations alone are insufficient to survive dismissal. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). Although Rule 12(b)(6) generally does not permit the court to look beyond the pleadings, the court may consider material attached to the complaint when evaluating a motion to dismiss. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

## DISCUSSION

I.   **Run Gum's Allegations under the Antitrust Laws**

   A.   **Agreement in Restraint of Trade**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Mere independent action is insufficient to trigger a Section 1 violation; rather, a party

must plead that multiple entities had a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (citations omitted). In the contract setting, this concerted action requirement is met when multiple entities are involved in either the establishment or enforcement of the contract's allegedly anticompetitive provisions. *Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978, 983 (9th Cir. 2001).

In *Toscano*, a golfer sued the Senior PGA Tour, as well as local sponsors who contracted with the PGA to organize individual golf tournaments. *Id.* at 980–81. As part of the contract, local sponsors agreed to adopt the PGA's rules, which laid out specific player eligibility requirements and forbid golfers from playing in conflicting tournaments without PGA pre-approval. *Id.* at 981–82. However, the PGA Tour Commissioner retained the discretion to waive or enforce the conflicting tournaments rule. *Toscano v. PGA Tour, Inc.*, 70 F. Supp. 2d 1109, 1111 (E.D. Cal. 1999), *aff'd sub nom. Toscano*, 258 F.3d at 978. The golfer alleged that, by implementing these regulations across all Senior PGA events, the PGA and its local sponsors had restricted competition between professional golfers and golf tournaments. *Toscano*, 258 F.3d at 983. The Ninth Circuit held there was no evidence that the local sponsors had agreed to restrain trade because they merely accepted the PGA's rules and played no role in creating or enforcing the regulations. *Id.* Because the various local sponsors "acted independently of the PGA Tour and of one another" when they entered into a tournament contract, and because the local sponsors themselves did not enforce the allegedly anticompetitive contract provisions, the Ninth Circuit affirmed the district court's order granting summary judgment to defendants. *Id.* at 984.

*Toscano* raises two issues: first, whether USATF played a role in creating USOC's advertising rules; and second, whether USATF will play a role in enforcing the Regulations. As

an initial matter, the complaint fails to plausibly allege USATF involvement in the establishment of USOC's apparel advertising policy. Like the local sponsors in *Toscano*, the agreement between USATF and USOC shows that USATF merely accepted that the Trials would be operated under USOC rules. Two uncontested aspects of the complaint make it implausible that USATF conspired to craft the Regulations. First, the apparel policy's plain language states that the logo restrictions are solely a creature of the USOC. Compl., ECF No. 1-1 ("As a U.S. Olympic Committee event, the U.S. Olympic Team Trials . . . are subject to . . . USOC advertising regulations for athletes' apparel and uniforms. As required by the USOC: . . . uniforms . . . of the competitors . . . at the Trials may not bear any commercial identification or promotional material"). Second, at track and field events where USATF retains full discretion over uniform advertising, USATF declines to prohibit individual apparel sponsorships. Compl. ¶¶ 43, 45. Together, these facts make it implausible that USATF has done anything more than passively accept the Regulations as a condition of organizing the Trials. Not only does the complaint deny any role for USATF in establishing the Regulations, but it also demonstrates that the Regulations are inconsistent with USATF's past practice when operating independent of USOC.

Nevertheless, under these allegations, I assume that USATF will enforce USOC's advertising rules. Unlike *Toscano*, where the local sponsors had no enforcement role, several of Run Gum's allegations suggest USATF will implement the logo restrictions. First, the Regulations state that athlete apparel "will be inspected during packet pick up at the Athlete Hospitality Lounge and during the final clerking process before competition to ensure compliance." Compl., ECF No. 1-1. The Regulations, which are posted on USATF's website, direct any questions to a USATF email address. Compl., ECF No. 1-1. USATF is both the

organizer and host of the Trials, as well as the entity responsible for clarifying the advertising and logo rules. USATF also retains the discretion to determine whether a manufacturer's logo violates the Regulations. Compl., ECF No. 1-1. On these allegations, it is plausible that USATF will inspect athlete uniforms, flag apparel with improper logos, and disqualify violating athletes. Moreover, a 2012 letter from USOC to USATF confirms USATF's role in apparel advertising enforcement. In it, USOC "ask[s]" USATF to remind athletes of both the apparel advertising rules in place at the 2012 Trials and the potential punishment that may result from a rules violation.[4] Compl. ¶ 39. Based on this past practice, it is plausible that USATF has played or will play a role in enforcing the Regulations at the Trials. Thus, I assume that Run Gum adequately alleges an agreement to restrain trade under *Toscano*'s enforcement prong.

### B.  Relevant Market

"In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a relevant market." *Newcal Indus., Inc. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008) (quotations omitted). A properly defined relevant market "includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Tanaka v. Univ. of So. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001). In other words, the relevant market must contain not only the product at issue, but also any economic substitutes for that product. *Newcal*, 513 F.3d at 1045. "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Id.* ("a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable."); *Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 886-87 (denying

---

[4] USATF contends that, like the Regulations themselves, the USATF's enforcement role was offered on a take-it-or-leave-it basis. While this is a persuasive argument, it is perhaps more suitable at summary judgment than a motion to dismiss.

motion for preliminary injunction because the "proposed relevant market cannot stand because it is comprises [sic] a single brand product" of live Cubs games.).

Run Gum describes its claim as one challenging a conspiracy of USOC, USATF, and unnamed co-conspirators "agreeing and conspiring to prevent certain businesses—while permitting others—from sponsoring individual athletes at the upcoming July 1-10, 2016 U.S. Olympic Track & Field Team Trials . . . in exchange for sponsor identification on the athletes' competition apparel." Compl. ¶ 1. In describing the relevant market, Run Gum alleges

> 40. The challenged conduct affects the market for sponsorship of individual athletes at the upcoming 2016 Olympic Trails in exchange for the display of the sponsors' name and/or logo on the competition [apparel] of those athletes at the Olympic Trials (the individual-sponsorship market"). The individual-sponsorship market concerns the highest level of track & field competition in the United States, the apex of the sport in this country, which occurs only every four years. This market is distinct in that it offers a unique commercial opportunity for individual sponsors for which there is no reasonable substitute or alternative.
>
> 41. The relevant geographic market consists of the entire United States and its territories.

Compl. ¶¶ 40–41.

Defendants make strong arguments challenging the alleged relevant market. *See* USOC Mot. to Dismiss, 2 (The "impossibly narrow, single-event alleged 'relevant market' in the complaint—a particular type of advertising (a third-party logo on an athlete's attire) at one particular location (the field of competition) during one particular event (the 2016 Track & Field Olympic Trials)—is at odds both with common sense and with Run Gum's own descriptions of the other advertising opportunities that it enjoys."). Additionally, a recent opinion from the Northern District of California indicates Run Gum's alleged market is impermissibly narrow. *Hicks v. PGA Tour, Inc.*, 15-cv-00489-VC, 2016 WL 928728 (N. D. Cal. Feb. 9, 2016). In *Hicks*, golf caddies brought antitrust claims against the PGA Tour, alleging the "bibs" worn by caddies violated sections 1 and 2 of the Sherman Act. The caddies alleged two relevant markets: the "live

9 – OPINION AND ORDER

action advertising market" and the "endorsement market". The court concluded other advertisements calculated to reach golf fans, such as magazine and television ads, or even advertisements on a wall or bridge at the golf course, were reasonably interchangeable with the alleged relevant markets. The alleged markets were "artificial, contorted to meet [plaintiffs'] litigation needs." *Id.* at *7.

Run Gum's alleged market too appears unnatural. Run Gum seems to have started out with what it wanted to accomplish—the ability to advertise on individual athlete apparel during in-play competition at the Trials—and drawn up a relevant market to accomplish those ends. Of course Run Gum has the ability to purchase myriad media advertisements involving sponsorship of individual athletes during the Trials. Many other advertisements, such as chryon graphics over an on-screen event timer, provide Run Gum with in-play competition eyeballs. Moving outside of the Trials themselves, Run Gum ignores other potential substitute markets such as individual athlete sponsorships during other "hallowed" running competitions, such as the Boston marathon. And, even as acknowledged in the complaint, individual athletes are generally free to advertise as they see fit during countless other USATF competitions. While I recognize the rather unique value of individual athlete sponsorships during any event associated with the "Olympics," it is precisely due to that linkage with the "Olympics" that advertisements during the Trials are so valuable. While that may cut in Run Gum's favor as to the alleged relevant market, it certainly cuts the other way, as explained below, in the implied immunity analysis.

C. *Per Se* Violation

Run Gum further alleges that USATF and USOC, together with unnamed co-conspirators, have engaged in a horizontal conspiracy which is a *per se* violation of the antitrust laws. Although the vast majority of antitrust claims are reviewed under a rule of reason analysis,

10 – OPINION AND ORDER

restraints that have immediately obvious anticompetitive effects may be deemed inherently illegal. *Leegin. Creative Leather Products, Inc. v. PSKS, Inc.*, 557 U.S. 877, 886 (2007); *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). In particular, these *per se* prohibitions are only appropriate where the restraint has "manifestly anticompetitive" implications and lacks "any redeeming value." *Leegin*, 557 U.S. at 886 (quotations and citations omitted). The Supreme Court has identified a highly limited number of trade restraints as *per se* antitrust violations, *id.* at 886, such as horizontal agreements among competitors to either fix pricing, *see Texaco*, 547 U.S. at 5, or divide markets, *see Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49–50 (1990).

Without deciding whether Run Gum's allegations are sufficient to establish a *per se* violation, I note that Run Gum's relevant pleading appears to lack the requisite evidentiary facts to survive Rule 12(b)(6). *See Kendall*, 518 F.3d at 1047. Run Gum's *per se* allegations are as follows:

> 26. Various other persons, firms, corporations, and entities (including, but not limited to, apparel and equipment manufacturers who are sponsoring individual athletes at the upcoming Olympic Trials) have actively participated as unnamed co-conspirators with the defendants in the violations and conspiracy alleged in this complaint—and continue to do so. In engaging in the offenses charged and violations alleged in this complaint, these co-coconspirators have performed overt acts and made statements in furtherance of the antitrust violations alleged here.
>
> 27. At all relevant times, the defendants and each co-conspirator ratified and/or authorized the wrongful acts of the defendants and each of the other co-conspirators. The defendants and their co-conspirators, including each individually, are participants as aiders and abettors in the improper acts and transactions that are the subject of this action.
>
> . . .
>
> 38. This anticompetitive agreement has horizontal and vertical aspects. Insofar as it is an agreement between and among USOC, USATF, apparel manufacturers, and equipment manufacturers, it is a vertical restraint. Insofar as it is an agreement between and among apparel manufacturers and equipment manufacturers, it is also a horizontal restraint.

Compl., ¶¶ 26–27, 38.

While the complaint contains plenty of boilerplate antitrust language, it lacks any specific factual allegations as to any potential horizontal co-conspirator. Run Gum does not allege any facts to support its theory that unnamed apparel and equipment manufacturers conspired with each other or with the USOC and USATF to restrain trade. Although Run Gum volleys these assertions at the unnamed apparel manufacturers and labels them co-conspirators, its boilerplate accusations fail to implicate the nameless manufacturers in any wrongdoing. Run Gum's conclusory statements do not meet the high threshold of a *per se* violation. Under today's heightened pleading standards, Run Gum's bare allegations come up short. *See Twombly*, 550 U.S. at 558–60; *see also Kendall*, 518 F.3d at 1047 (remarking that a "bare allegation of a conspiracy is almost impossible to defend against, particularly where the defendants are large institutions with hundreds of employees entering into contract and agreements daily").

## II. Implied Immunity under the ASA

The Amateur Sports Act of 1978 (later amended as the Ted Stevens Amateur Sports Act) grants the USOC the "exclusive jurisdiction . . . over . . . all matters pertaining to United States participation in the Olympic Games . . . including representation of the United States in the Games." 36 U.S.C. § 220503(3) (2012). At its core, Congress passed the ASA in order to secure financing for the U.S. Olympic Team, particularly through the fundraising capabilities of a new organization established by the Act: the USOC. *Eleven Line v. North Texas State Soccer Ass'n*, 213 F.3d 198, 203 (5th Cir. 2000); *U.S. Olympic Comm. v. Intelicense Corp., S.A.*, 737 F.2d 263, 263 (2d Cir. 1984). As the only nation that does not provide its Olympic team with federal funding or subsidies, the United States instead relies on the USOC to raise the financial resources necessary to organize Team USA and to compete in the Olympic Games. *Id.* For this reason, the

ASA also authorizes the USOC to "organize, finance, and control the representation of the United States in the competitions and events of the Olympic Games." § 220505(c)(3). Concomitant with the USOC's mission, which it historically achieves in large part by soliciting corporate sponsorships, *Intelicense*, 737 F.3d at 266 n. 3, the Act grants the USOC "unfettered control over the commercial use of Olympic-related designations," such as the Olympic rings. *Id.* at 266. By investing the USOC with this exclusive authority over the Olympic brand, Congress intended to enable the USOC to raise money with which to finance the U.S. Olympic Team. *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 538–39 (1987).

Underneath the USOC, the ASA recognizes national governing bodies, such as USATF, for each Olympic sport. *See* 36 U.S.C. § 220521. These NGBs are fundamental to coordinating amateur athletics in the United States; they exercise "monolithic control" over particular sports by, for example, establishing governance structures, setting national goals, and recommending the membership of Team USA. *Eleven Line*, 213 F.3d at 203; *Behagen v. Amateur Basketball Ass'n of U.S.*, 884 F.2d 524, 529 (10th Cir. 1989); *see also* 36 U.S.C. §§ 220522–220524. Out of these sweeping grants of authority, courts have conferred the USOC and its partner NGBs with limited implied immunity from antitrust liability on issues stretching from the scheduling of individual competitions to athlete eligibility. *See, e.g. JES Properties, Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224, 1232 (11th Cir. 2006) (United States Equestrian Foundation immune from antitrust liability where it set up scheduling rules to minimize competition conflicts); *Behagen v. Amateur Basketball Ass'n of U.S.*, 884 F.2d 524, 529 (10th Cir. 1989) (antitrust exemption inferred from ASA where basketball NGB established player eligibility rules).

As a matter of statutory construction, implied exemptions from the antitrust laws are disfavored. *Silver v. New York Stock Exch.*, 373 U.S. 341, 357 (1963) (courts may not grant

implied immunity unless an exemption is "necessary to make [a statutory scheme] work, and even then only to the minimum extent necessary"). Congressional intent is the bellwether of implied immunity—such an exemption is only permissible when "necessary to implement the clear intent of Congress." *Behagen*, 884 F.2d at 529. Consequently, this court's inquiry hinges on whether "the application of the antitrust laws to the facts of this case would 'unduly interfere' with the 'operation' of the ASA." *JES Properties*, 458 F.3d at 1231 (quoting *Gordon v. New York Stock Exch.*, 422 U.S. 659, 686 (1975)). Rather than narrowly focus on the merits of a particular regulation, courts instead have granted implied immunity where a broader category of rules are necessary to carry out the mission of an NGB. *See id.* at 1232 (citing *Behagen*, 884 F.2d at 524–30).

In *JES Properties*, for instance, the Eleventh Circuit held that the NGB for equestrian competitions (United States Equestrian Foundation or "USEF") was entitled to antitrust immunity under the ASA. *Id.* at 1228. There, horse promoters brought antitrust claims against USEF, arguing that mileage restrictions on non-NGB affiliated horse shows unreasonably restrained trade. *Id.* at 1226–27. USEF promulgated rules restricting non-affiliated horse competitions from operating on the same day as USEF events within certain distances. *Id.* Plaintiffs challenged the mileage restrictions, arguing that the rules gave USEF and its affiliated shows a monopoly over specific horse competitions and prevented competitors from entering the market. *Id.* at 1227–28. Plaintiffs also contended that, because the mileage rule was not essential to any core USEF function, the NGB was not entitled to implied immunity under the ASA. *Id.*

Relying on the text and purpose of the Act, the Eleventh Circuit disagreed and extended implied immunity to USEF. The ASA directs NGBs to "minimize, through coordination with other amateur sports organizations, conflicts in the scheduling of all practices and competitions

. . . ." 36 U.S.C. § 220524(2). Noting that the ASA allows an NGB to exert "monolithic control," the court held that USEF was immune because the mileage rule minimized scheduling conflicts and thus implemented the clear intent of Congress; any potential antitrust liability for promulgating the mileage rule would have been "plainly repugnant to the ASA." *JES Properties*, 458 F.3d at 1231–32. Even though a less restrictive mileage rule may have been able to reduce scheduling conflicts, the Eleventh Circuit looked to the broader purpose of the ASA and found that the specific regulations fell within USEF's authority. *Id.* at 1232.

Similarly, in *Behagen*, the 10th Circuit considered whether amateur eligibility rules promulgated by the Amateur Basketball Association of the United States (ABA) violated the Sherman Act. 884 F.2d at 525. In that case, the ABA—the NGB for basketball—determined that its eligibility regulations precluded the plaintiff from competing in amateur events because he had previously played professional basketball several times. *Id.* at 525–26. Although the plaintiff contended that these eligibility requirements violated the antitrust laws, the ASA granted NGBs the authority to establish amateur eligibility regulations. *Id.* at 528. As a result, drawing on the ABA's "monolithic control" over basketball, the 10th Circuit found that the eligibility rules "were clearly within the scope of activity directed by Congress, and were necessary to implement Congress's intent." *Id.* at 527–28. For this reason, the court held that the promulgation of player eligibility rules by an NGB were exempt from federal antitrust laws. *Id.* at 527.

Here, the text and purpose of the ASA likewise confirm that, when the USATF and USOC promulgate logo regulations which restrict commercial advertising on athlete apparel, they are entitled to antitrust immunity. First, the ASA allows the USOC, through its partner NGBs, to "organize, finance, and control" the representation of the United States in the Olympic

Games. 36 U.S.C. § 220505. Second, the Act further grants the USOC exclusive rights to not only the Olympic rings, but to the very word "Olympic." § 220506. Read together with Congress's clear intent in passing the ASA—to financially support Team USA through USOC fundraising, *see San Francisco Arts*, 483 U.S. at 538–39; *Intelicense*, 737 F.2d at 264—these provisions enable the USOC and USATF to issue regulations that restrict apparel advertising in order to protect the value of the Olympic brand.

The logo restrictions in this case directly implicate USOC's ability to generate revenue for the United States Olympic Team; allowing any company to advertise on competitor apparel would unduly interfere with USOC's fundraising mission. First, the Regulations prevent a dilution of the Olympic brand. The Regulations permit the USOC and USATF to play a gatekeeping function which preserves the exclusivity—and thus value—of the Olympic symbols and name. By strictly limiting the advertisements that can appear on the field of competition itself, the Defendants can control the use of the Olympic brand and preserve the integrity of their primary fundraising mechanism. Second, the Regulations bolster the value of USOC's and USATF's corporate sponsorships. If, instead of purchasing an official sponsorship through USATF, would-be advertisers could instead place their logos directly on high-profile athletes, the value of these corporate sponsorships would necessarily decrease. Accordingly, the Regulations are necessary to implement the clear intent of Congress and to make the ASA's statutory scheme work. Without them, USOC's revenue-generating capabilities would be compromised in a way that is plainly repugnant to the text and purpose of the Act.

Run Gum contends that its proposed advertising is not an attack on the Olympic brand and would not undermine USOC's fundraising abilities, particularly in light of the manufacturers' and running club exceptions embedded within the Regulations. Pl.'s Resp. Br.,

ECF. No. 45, at 9. I disagree. First, Run Gum clearly seeks to capitalize on the unique nature of the Olympic brand generally, and the Olympic Trials in particular, in order to promote its product. *See* compl. ¶¶ 4–5 (describing the Trials as a "singular" and "infrequent[t]" event that serves as the "zenith of track [and] field"); compl. ¶ 40 (noting the "unique commercial opportunity" that the Trials present, which has "no reasonable substitute or alternative" for advertising purposes"); compl. ¶ 45 (depicting the Olympic Trials as offering "unique marketing possibilities and aura" due to its "hallowed opportunity to witness . . . who will go on to the Olympic Games"). To the extent that Run Gum attempts to associate with the Trials' public profile and alleged sanctity, it treads on ground that Congress reserved for USOC and USATF. Second, the relief that Run Gum seeks—an injunction preventing Defendants from enforcing the Regulations at the 2016 Olympic Trials—would open the floodgates to a myriad of potential apparel advertisements, not just Run Gum's.[5] Third, although Run Gum's frustration with the manufacturer and club exceptions may be well-taken, my review of the Regulations focuses on the USOC's broad authority to restrict advertising, not the specific merits of particular rules. *See JES Properties*, 458 F.2d at 1232 (citing *Behagen*, 884 F.2d at 524–30).

Finally, Run Gum characterizes any extension of implied immunity to the facts of this case as "breathtaking" and allowing the USOC to "fix prices with abandon." Pl.'s Resp. Br., ECF No. 45, at 10. Here, however, we are not dealing with "limitless antitrust immunity." Instead, the question is whether the USOC's decision to limit competition apparel-based advertising to equipment and apparel manufacturers goes too far. It does not. The Regulations center on the

---

[5] In its prayer for relief, Run Gum only seeks to enjoin USATF and USOC from enforcing the Regulations against Run Gum. Although overly broad injunctions are an abuse of discretion, injunctive relief "must be tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). Here, Run Gum's alleged harm—an illegal restraint of trade—affects not just Run Gum, but any would-be apparel advertiser. Due to the wide-ranging nature of the alleged harm, I have serious doubts that an injunction limited to potential Run Gum advertisements would be appropriately tailored.

17 – OPINION AND ORDER

USOC's and USATF's ability to control what athletes wear on the field of competition at the Olympic Trials. Given the exclusive and unfettered power that Congress delegated to Defendants in the ASA, I find that the Regulations are a proper exercise of their statutory authority. Despite Run Gum's contentions to the contrary, immunizing the Regulations from antitrust liability does not unmoor the USOC from all responsibility under the Sherman Act. Rather, it allows USOC and USATF to preclude athletes from becoming human billboards at the Trials—a ban which is necessary to finance Team USA. Accordingly, I conclude that USATF and USOC are not subject to antitrust liability for the apparel advertising restrictions at issue in this case.

## CONCLUSION

Under the Amateur Sports Act, USOC and USATF are impliedly immune from Run Gum's challenge to their regulations. USATF's motion, ECF No. 43, and USOC's motion, ECF No. 41, are GRANTED and Run Gum's complaint is DISMISSED, with prejudice.

IT IS SO ORDERED.


DATED this 11 day of May 2016.


                                                  Michael J. McShane
                                             United States District Judge